EXPERIS US LLC,
d/b/a Jefferson Wells,

Case No.

Plaintiff,

v.

PARKE BANCORP, INC,
d/b/a Parke Bank,

Defendant.

## COMPLAINT

### PRELIMINARY STATEMENT

Plaintiff Experis US LLC, d/b/a Jefferson Wells ("Jefferson Wells"), brings this action for breach of contract against Defendant Parke Bancorp, Inc, d/b/a Parke Bank ("Parke Bank"). The claim arises from Parke Bank's failure to pay invoices for professional services rendered by Jefferson Wells pursuant to a Master Services Agreement and two Statements of Work. Jefferson Wells promptly demanded payment of $1,119,947.50 for services rendered. Parke Bank has failed to pay even a single invoice due and owing to Jefferson Wells.

### THE PARTIES

1.     Plaintiff Experis US LLC, d/b/a Jefferson Wells, is a Wisconsin limited liability company with its principal office located at 100 Manpower Place, Milwaukee, Wisconsin 53212. Jefferson Wells' sole member is ManpowerGroup Global, Inc., a Wisconsin Domestic Corporation with its principal office located at 100 W. Manpower Place, Milwaukee, WI 53212.

2.     Defendant Parke Bancorp, Inc, d/b/a Parke Bank, is a New Jersey corporation with its principal office located at 601 Delsea Drive, Sewell, New Jersey 08080.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action involves a matter in controversy exceeding the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. 28 U.S.C § 1332(a)(1)-(2).

4.     This Court has personal jurisdiction over Defendant and is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(3) because, upon information and belief, Defendant does substantial business in the State of Wisconsin and the counties comprising the Eastern District of Wisconsin.

## FACTUAL BACKGROUND

**I.     The Master Services Agreement**

5.     On or about July 7, 2025, Jefferson Wells and Parke Bank executed a Master Services Agreement ("MSA").

6.     A true and correct copy of the MSA is attached hereto as **Exhibit A**.

7.     Alongside, and as contemplated by Section 1 of the MSA, Jefferson Wells and Parke Bank executed two Statements of Work: the Look Back Consulting Services Statement of Work, and the BSA Alerts Backlog Clearance Services Statement of Work (collectively, the "Agreements").

**II.     Look Back Consulting Services Statement of Work**

8.     On or about July 7, 2025, Jefferson Wells and Parke Bank executed the Look Back Consulting Services Statement of Work ("SOW 1").

9.     A true and correct copy of SOW 1 is attached hereto as **Exhibit B**.

10. Under SOW 1, Jefferson Wells agreed to provide professional services to Parke Bank beginning on or about July 14, 2025.

11. SOW 1 sets forth the fees due and owing to Jefferson Wells from Parke Bank for the professional services rendered.

12. Under Section 2 of the MSA, Parke Bank agreed to pay Jefferson Wells for the services rendered under SOW 1 pursuant to the fees and rates set forth in SOW 1.

13. Under SOW 1, Jefferson Wells was to invoice Parke Bank on a bi-weekly basis.

14. Under SOW 1 and Section 2 of the MSA, Parke Bank was required to pay Jefferson Wells within thirty (30) days of receipt of an undisputed invoice.

15. Under SOW 1, "Client Responsibilities" were established, providing that "[i]t is expected that all information, data and records required to satisfy the above project objectives and will be provided on a timely basis by [Parke Bank] to the JW team. JW will promptly notify [Parke Bank] senior manager of any/all missing items or systems access issues that could slow down the work, and timely resolution of such items will be critical to ensure project objectives are met within the stated time frame. Any material delay in the supply of information by [Parke Bank] to the JW team will be deemed cause for a change order to this SOW."

16. Under SOW 1, a "Change Order Process" was established, providing that "if JW incurs additional work, at the request of, or with notice to Client, that is outside the scope of Services in this SOW, Client shall compensate JW at the same rates as those described under Fees & Expenses above."

## III. BSA Alerts Backlog Clearance Services Statement of Work

17. On or about August 1, 2025, Jefferson Wells and Parke Bank executed the BSA Alerts Backlog Clearance Services Statement of Work ("SOW 2").

18.     A true and correct copy of SOW 2 is attached hereto as **Exhibit C**.

19.     Under SOW 2, Jefferson Wells agreed to provide professional services to Parke Bank beginning on or about August 6, 2025.

20.     SOW 2 sets forth the fees due and owing to Jefferson Wells from Parke Bank for the professional services rendered.

21.     Under Section 2 of the MSA, Parke Bank agreed to pay Jefferson Wells for the services rendered under SOW 2 pursuant to the fees and rates set forth in SOW 2.

22.     Under SOW 2, Jefferson Wells was to invoice Parke Bank on a bi-weekly basis.

23.     Under SOW 2 and Section 2 of the MSA, Parke Bank was required to pay Jefferson Wells within thirty (30) days of receipt of an undisputed invoice.

24.     Under SOW 2, "Client Responsibilities" were established, providing that "[i]t is expected that all information, data and records required to satisfy the above project objectives will be provided on a timely basis by [Parke Bank] to the JW team.  JW will promptly notify [Parke Bank] senior manager of any/all missing items or systems access issues that could slow down the work, and timely resolution of such items will be critical to ensure project objectives are met within the stated time frame. Any material delay in the supply of information by [Parke Bank] to the JW team may impede our progress and will be discussed with senior management to determine if a change order to this SOW will be needed."

25.     Under SOW 2, a "Change Order Process" was established, providing that "if JW incurs additional work, at the request of, or with notice to Client, that is outside the scope of Services in this SOW, Client shall compensate JW at the same rates as those described under Fees & Expenses above."

**IV.     Termination and Breach Terms of the Agreements**

26.     Under Section 4 of the MSA, either party may terminate the MSA or any individual statement of work immediately upon notice to the other party if the other party breaches any of its material duties or obligations under the Agreements and does not cure such breach within ten (10) business days after notice thereof, or fails to make any payments within the time periods specified.

27.     Under Section 4 of the MSA, upon termination of the MSA or any individual statement of work, Jefferson Wells agreed to provide an invoice to Parke Bank for all fees incurred but unpaid by Parke Bank under the MSA or individual statement of work as applicable (the "termination invoice").

28.     Under Section 4 of the MSA, Parke Bank agreed to pay the amount set forth on the termination invoice within thirty (30) days of receipt.

## V.     Parke Bank's Breach of the Agreements

29.     Jefferson Wells fulfilled all of its obligations under the Agreements.

30.     Jefferson Wells communicated regularly with Parke Bank throughout its engagement, providing weekly status reports to Parke Bank describing progress from the prior week, technical issues that have occurred, RFI's that remain outstanding, production budget to actual hours by task, etc. Jefferson Wells was also responsive to all of Parke Bank's questions.

31.     In contrast, Parke Bank consistently requested that Jefferson Wells perform work that is outside the scope of the Agreements, refused to execute written change orders to reflect the modified scope of work requested, and was unresponsive to several of Jefferson Wells' requests for additional information, assistance, and the ability to install an automated tool to Parke Bank's systems that would facilitate Jefferson Wells completing the tasks contemplated by the SOWs.

32.     Jefferson Wells invoiced Parke Bank for services it provided under the Agreements, but Parke Bank has failed to make any payment whatsoever to Jefferson Wells.

33. On or about November 18, 2025, Jefferson Wells notified Parke Bank that Parke Bank was in breach of the Agreement for, among other things, failure to make payment within the time required under Section 2 of the MSA.

34. A true and correct copy of the November 18, 2025 notice is attached hereto as **Exhibit D**.

35. In response to Jefferson Wells' notice, Parke Bank emailed its refusal to meet with Jefferson Wells on November 19, 2025, and indicated that the parties were at an impasse.

36. Based on Parke Bank's November 19, 2025 email, Jefferson Wells terminated the MSA, SOW 1, and SOW 2 pursuant to Section 4 of the MSA due to Parke Bank's failure to pay Jefferson Wells' invoices within the 30-day time period specified in the MSA.

37. A true and correct copy of Jefferson Wells' termination notice dated November 19, 2025 is attached hereto as **Exhibit E**.

38. Jefferson Wells promptly invoiced Parke Bank for all previously unbilled amounts due under the Agreements following termination.

39. Jefferson Wells' unpaid invoices total $1,119,947.50 for professional services rendered under the Agreements.

40. On or about December 5, 2025, Jefferson Wells, through counsel, sent a demand for payment to Parke Bank (the "Demand Letter").

41. A true and correct copy of the Demand Letter is attached hereto as **Exhibit F**.

42. The Demand Letter set a payment deadline of December 15, 2025 for all past due payments.

43. Parke Bank failed to make any payment to Jefferson Wells.

44. Parke Bank owes Jefferson Wells $1,119,947.50 for services rendered under the Agreement.

## COUNT I – BREACH OF CONTRACT

45. Plaintiff repeats and realleges the allegations set forth in each of the proceeding paragraphs as though fully set forth herein.

46. The Agreements are valid, enforceable contracts between Jefferson Wells and Parke Bank.

47. Parke Bank promised to pay Jefferson Wells for Jefferson Wells' professional services.

48. Jefferson Wells provided the professional services to Parke Bank as promised.

49. Parke Bank failed to pay Jefferson Wells for the professional services.

50. Parke Bank's conduct constitutes a breach of contract.

51. As a result of Parke Bank's breach, Jefferson Wells has suffered damages in the amount of $1,119,947.50, as well as unpaid interest, costs and fees.

## COUNT II – UNJUST ENRICHMENT

52. Plaintiff repeats and realleges the allegations set forth in each of the proceeding paragraphs as though fully set forth herein.

53. Jefferson Wells conferred valuable services and benefits on Parke Bank.

54. Parke Bank accepted and retained the value of those services and benefits.

55. Under the circumstances, it would be unjust for Parke Bank to retain the benefits of Jefferson Wells' services without paying the reasonable value thereof, including the invoiced amounts.

56. Parke Bank's unjust enrichment has caused monetary damage to Jefferson Wells in the amount of $1,119,947.50, as well as unpaid interest, costs and fees.

## COUNT III – QUANTUM MERUIT

57. Plaintiff repeats and realleges the allegations set forth in each of the proceeding paragraphs as though fully set forth herein.

58. Parke Bank requested Jefferson Wells' services.

59. Jefferson Wells, in good faith, performed the services requested of it and expected reasonable value for such services.

60. Jefferson Wells is entitled to reasonable compensation for the services it rendered to Parke Bank.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

i. Judgment in favor of Plaintiff Jefferson Wells against Defendant Parke Bank in an amount of $1,119,947.50;

ii. All applicable costs and fees; and

iii. Any other relief this Court deems just and equitable.

Dated this 9th day of February, 2026.

/s/ _Shauna Manion_
Brandon M. Krajewski, Bar No. 1090077
L. Katie Mason, Bar No. 1060063
Shauna D. Manion, Bar No. 1091704
QUARLES & BRADY LLP
411 E. Wisconsin Ave., Suite 2400
Milwaukee, WI 53202
Tel: (414) 277-5000
brandon.krajewski@quarles.com
katie.mason@quarles.com
shauna.manion@quarles.com

_Counsel for Plaintiff EXPERIS US LLC,_
_d/b/a Jefferson Wells Division_

Exhibit A

Docusign Envelope ID: AF86524A-85BF-470D-8110-E4B0C61DD43C



## MASTER SERVICES AGREEMENT

Experis US LLC, a Wisconsin limited liability company with its principal office located at 100 Manpower Place, Milwaukee, Wisconsin 53212, for its Jefferson Wells division, on behalf of itself and its affiliates and subsidiaries (each, an "Affiliate," and, collectively, "Jefferson Wells"), and Parke Bancorp, Inc, a New Jersey Corporation with its principal office located at 601 Delsea Drive Sewell, NJ 08080 ("Client"), in consideration of the mutual covenants contained herein, effective as of July 7, 2025, hereby agree as follows:

**1.  STRUCTURE OF THE AGREEMENT**.  This agreement consists of the provisions set forth in (i) this Master Services Agreement ("MSA") and (ii) any statement of work or assignment order executed by the relevant Affiliate pursuant to and in accordance with the terms herein, including any exhibits, appendices and schedules referenced therein or attached thereto (each an "SOW" and, together with the MSA, the "Agreement"). Each SOW will include a description of (i) the services to be provided by the relevant Affiliate to Client (the "Services"), (ii) the fees and other payment terms, (iii) any warranty applicable to the Services, and (iv) any Client obligations in connection with the Services.  The Affiliate signing an SOW shall be solely responsible for the delivery of, and solely liable for any claims arising from, the Services described in such SOW.  In the event of a conflict between the terms and conditions of an SOW and this MSA the MSA will control, except for (i) payment and invoicing terms and (ii) any provision of an SOW expressly supplementing or superseding a provision of the MSA.

**2.  FEES AND PAYMENT**.  Client agrees to pay Jefferson Wells for its Services and any other costs or fees at the rate(s) set forth in each SOW.  Except as otherwise provided in an SOW, Jefferson Wells will invoice Client  bi-weekly at the address set forth above and payment will be due within thirty (30) days of Client's receipt of an undisputed invoice.  Any late invoicing by Jefferson Wells will not affect Client's obligation to pay for services rendered.

**3.  NON-SOLICIT.**  Except for employees hired or contractually engaged subject to an agreed upon conversion fee as provided in an SOW, or employees who have a separate non-compete agreement in place, during the term of this Agreement and for twelve (12) months thereafter, the parties each agree that neither party, nor any of such party's employees or agents will directly, or indirectly through another supplier, solicit, hire, or contractually engage an employee of the other party directly involved in performing Services or work under this Agreement.  In the event a party hires or contractually engages such employee in violation of this provision, the violating party shall pay the other party a fee equal to thirty percent (30%) of the individual's total starting salary or annual hourly equivalent (at 40 hours/week) as an employee or contractor. Notwithstanding the foregoing, neither the general solicitation of employees (through, for example, advertisements in newspapers, magazines or trade journals), nor the hiring or contractually engaging any employee who responds to such a general solicitation, nor the hiring or contractually engaging any employee who terminates employment without inducement, will be a violation of this Section 3.

**4.  TERM AND TERMINATION**.  The term hereof commences on the date first set forth above or, if no date has been filled in above, the date of the last signature below (in either case, the "Effective Date"), and will continue until the Agreement is terminated pursuant to this section.  Either party may terminate the Agreement or any individual SOW without cause upon thirty (30) days' prior written notice to the other party. In addition, either party will have the option to terminate the Agreement immediately upon notice to the other party if the other party (i) breaches any of its material duties or obligations under the Agreement and does not cure such breach within ten (10) business days after notice thereof; (ii) declares or becomes bankrupt, dissolves or is subject to a material deterioration in creditworthiness; or (iii) fails to make any payments within the time periods specified herein.  Upon termination of this Agreement or any individual SOW, Jefferson Wells will promptly provide an invoice to Client for all fees incurred but unpaid by Client under the Agreement or individual SOW, as applicable, and Client will pay the amount set forth on such invoice within thirty (30) days of receipt.

Docusign Envelope ID: AF86524A-85BF-470D-8110-E4B0C61DD43C

**5. CONFIDENTIAL INFORMATION.** Each party acknowledges that it may receive information that is proprietary or confidential to the other party and/or its affiliated companies and clients. During the term of this Agreement and for three (3) years thereafter, both parties agree to take reasonable measures to hold such information in strict confidence and not to disclose such information to third parties or to use such information for any purpose whatsoever other than performing hereunder or as required by law. Upon termination of this Agreement or upon written request of the disclosing party, the receiving party will return (or, if requested, destroy) the confidential information of the disclosing party in the possession of the receiving party at such time.

**6. INTELLECTUAL PROPERTY RIGHTS.** Unless otherwise provided in an SOW, any discoveries, inventions, concepts or ideas, and modifications thereof, made or conceived pursuant to this Agreement is a "work made for hire" and Client retains all right, title and interest in and to any and all such "work made for hire." Jefferson Wells retains all right, title and interest in and to any and all business processes, methodologies, analysis frameworks, systems, patents, trademarks, service marks, business names, copyright, trade secrets, inventions, discoveries, concepts, ideas, works of authorship, software, computer programs, modules, data, documentation, manuals, guidelines, database rights, designs, drawings, test results, tools, confidential information and skills, and all modifications thereof, owned, developed by or licensed to Jefferson Wells prior to or independent of this Agreement (the "Jefferson Wells Background Materials"). Client retains all right, title and interest in and to any and all business processes, methodologies, analysis frameworks, systems, patents, trademarks, service marks, business names, copyright, trade secrets, inventions, discoveries, concepts, ideas, works of authorship, software, computer programs, modules, data, documentation, manuals, guidelines, database rights, designs, drawings, test results, tools and confidential information, and all modifications thereof, owned, developed by or licensed to Client (the "Client Materials"). Except for the Jefferson Wells Background Materials, Jefferson Wells hereby assigns all of its rights, title, and interest in and to any "Deliverables" (as such term may be defined in an SOW) to Client, and Client retains all right, title and interest in such Deliverables.

**7. INSURANCE.** Jefferson Wells will maintain in force during the term of this Agreement insurance coverage as follows: (i) Workers' Compensation Insurance with statutory limits; (ii) Employers Liability Insurance with limits of at least $500,000 for each accident or disease; (iii) Commercial General Liability and Property Damage Insurance, including coverage for products and completed operations, with limits of at least $2,000,000 for each occurrence; and (iv) Excess Automobile Liability Insurance, with limits of at least $1,000,000 for each occurrence, applicable only to Jefferson Wells employees who operate their own vehicles.

**8. INDEMNIFICATION AND LIMITATION OF LIABILITY.** Except as provided herein, Jefferson Wells agrees to defend, indemnify and hold Client and its parent, subsidiaries, directors, officers, agents, representatives and employees harmless of and from any and all claims, losses and liabilities to the extent caused by Jefferson Wells' breach of this Agreement or by Jefferson Wells' negligence, gross negligence, recklessness or willful misconduct. Except as provided herein, Client agrees to defend, indemnify and hold Jefferson Wells and its parent, subsidiaries, directors, officers, agents, representatives and employees harmless of and from any and all claims, losses and liabilities to the extent caused by Client's breach of this Agreement or by Client's negligence, gross negligence, recklessness or willful misconduct. This Section 8 and any indemnities expressly set forth in any SOW(s) represent the complete agreement between the parties with respect to any possible indemnification claim. Each party hereby waives its right to assert any common-law indemnification or contribution claim against the other. Each party agrees to (i) promptly inform the other party after its receipt of any claim, demand or notice for which indemnification hereunder may be sought and (ii) cooperate in the investigation and defense of any such claim, demand or notice.

**NEITHER PARTY SHALL BE LIABLE FOR OR REQUIRED TO INDEMNIFY ANY OTHER PARTY FOR ANY INCIDENTAL, CONSEQUENTIAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, INCLUDING LOST PROFIT, REGARDLESS HOW CHARACTERIZED AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, WHICH ARISE FROM THE PERFORMANCE OF THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT, AND**

Docusign Envelope ID: AF86524A-85BF-470D-8110-E4B0C61DD43C

**REGARDLESS OF THE FORM OF ACTION (WHETHER IN STRICT LIABILITY OR OTHERWISE). NEITHER PARTY'S LIABILITY FOR DAMAGES OR INDEMNITY UNDER THIS AGREEMENT REGARDLESS OF THE FORM OF ACTION WILL EXCEED PER CLAIM AND IN THE AGGREGATE THE TOTAL AMOUNT ACTUALLY PAID BY CLIENT UNDER THE RELEVANT SOW DURING THE TWELVE (12) MONTHS PRECEDING THE EVENTS GIVING RISE TO THE LIABILITY. NOTWITHSTANDING ANYTHING TO THE CONTRARY, THE FOREGOING LIMITATION OF LIABILITY WILL NOT EXTEND TO ANY PAYMENTS FOR SERVICES OWED BY CLIENT.**

**9. MISCELLANEOUS.** This Agreement contains the entire understanding between the parties pertaining to the subject matter hereof and supersedes all prior agreements, negotiations and understandings relating to the subject matter hereof. No provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing signed by both parties. Neither party may, directly or indirectly, in whole or in part, either by operation of law or otherwise, assign or transfer this Agreement or delegate any of its obligations under this Agreement without the other party's prior written consent, except that either party may assign or transfer this Agreement or delegate any rights or obligations thereunder without consent in connection with a merger, reorganization, transfer, sale of assets or product lines, or change of control or ownership. Neither party will be responsible for failure or delay in performance hereunder if the failure or delay is due to labor disputes, strikes, fire, riot, war, terrorism, pandemic, acts of God or any other causes beyond the control of the non-performing party. Except as expressly provided herein, those provisions of this Agreement that by their terms extend beyond the termination hereof will remain in full force and effect and survive such termination, including without limitation, Sections 3, 4, 5, 6,7 and 8. Each party shall comply with all laws consistent with its obligations hereunder and applicable to its business generally, including but not limited to all applicable laws regarding non-discrimination in employment, fair labor standards and data privacy. Jefferson Wells may provide Services through Affiliates and subcontractors. Upon request by Jefferson Wells, Client agrees to provide a reference for the benefit of Jefferson Wells, at least three (3) times annually. Jefferson Wells may reference Client's name, logo and other marks in Jefferson Wells marketing materials and responses to requests for proposals. All notices to a party required under this Agreement must be in writing to the receiving party's address included in the preamble above. This Agreement will be governed in all respects by the laws of the State of New Jersey, without regard to its conflict of laws principles. The parties consent to the jurisdiction of any state or federal court in New Jersey for the resolution of any disputes in connection with this Agreement. The parties represent and warrant (i) that they have full corporate power and authority to execute this MSA and to perform their respective obligations hereunder and (ii) that the person whose signature appears below is fully authorized to enter into this MSA on behalf of the party he or she represents. There are no warranties, representations or other agreements between the parties in connection with the subject matter hereof except as specifically set forth in this Agreement.

IN WITNESS WHEREOF, this MSA has been duly executed by authorized signatories of Jefferson Wells and Client as of the Effective Date.

**EXPERIS US LLC FOR ITS JEFFERSON WELLS DIVISION**

By: _Chris Wasilk_
Signature

Chris Wasilk
Printed Name

SVP
Title

July 7, 2025
Date Signed

**PARKE BANCORP, INC**

By: _____
Signature

Ralph Gallo
Printed Name

EVP & COO
Title

7/7/2025
Date Signed

Exhibit B

# Look Back Consulting Services
Statement of Work

## Prepared for:
## Parke Bank





July 1, 2025

# Privacy of Content

The information contained herein is considered privileged, confidential and the property of Jefferson Wells, a division of Experis US, LLC. Its release to third parties would offer substantial benefit to competitors offering similar services. The use or release of this information by the named party above for purposes other than evaluation of its content, or as a basis for contract award, is not authorized.

July 1, 2025

Ralph Bonadies
SVP/CRO/BSAO
Parke Bank
601 Delsea Drive
Sewell, NJ 08080

Dear Ralph:

Thank you for providing Experis US, Inc. with the opportunity for its Jefferson Wells division ("JW") to assist Parke Bank ("Client") with Look Back Consulting Services. The following Statement of Work ("SOW") confirms our understanding of the professional services JW will provide to Client and is issued in accordance with and shall be governed by the terms and conditions of the Master Services Agreement between Experis, and the Client ("Agreement"). All capitalized terms used in this SOW but not defined herein, shall have the meanings set forth in the Agreement.

## JW Services and Responsibilities

The service period for this SOW is for the period commencing on or around 7/14/2025 through 11/15/2025. All services will be performed by Jefferson Wells professionals under our direction. We will coordinate with the client key milestones and project decisions. The JW professionals will work remotely, or onsite as required by the Client, using a Client provided laptop or JW laptop if requested.

The JW personnel shall observe Client's reasonable policies regarding working conditions and business hours; to the extent such policies are made known to the JW personnel.

## Scope and Approach

Below is our general methodology, based on what we know. We will confirm and tailor this during the planning phase of this engagement.

| TASK 1 | TASK 2 | TASK 3 | TASK 4 | TASK 5 |
|---|---|---|---|---|
| (17 Case Investigations & SAR Narratives) | (300 Case Investigations) | (270 Case Investigations) | (Case Investigation Quality Control) | (SAR Documentation Quality Control) |

We've included detailed information about each task on the following pages.

### Task 1

Amend the 17 case investigations that previously resulted in non-SARs. Decision the amended case investigations to confirm that they should, in fact, result in filed SARs.

Re-examining the investigations requires cautious review to validate or revise the original determination. We'll assign two individuals, familiar with FCRM and the intricacies of marijuana-related SAR requirements, to perform the necessary case searches, transaction reviews, and to update SAR decisions using matrix logic, as well as new narrative (if necessary). All cases and SAR determinations will receive quality control checks to ensure consistency across all documentation.

Approximate time to execute:

- 8 hours per SAR for our analysts to properly investigate and amend.
- 9 business days to fully complete this task

## Task 2

Conduct case investigations on the 300 business and individual customers that had a combined total of 3,898 FCRM AML system generated alerts. Decision the case investigations to identify those that do or do not require a SAR filing.

We'll deploy analysts to meet required throughput of case investigations for the 300 business and individual customers. All narrative documentation is efficiently written to standard.

Approximate time to execute:
- 4 hours per case investigation.
- 2 hours per case to review and obtain Quality Control approval

## Task 3

Conduct case investigations of the transactions in question conducted by the 270 business and individual customers relating to the seven identified networks. Decision the case investigations to identify those that do or do not require a SAR filing.

This task involves high-risk networks and requires further data analytics. We use Python and R Studio to cluster linked customers and flag shared activity patterns, allowing Analysts to review the 270 businesses and individual customers for certain typologies and patterns (e.g., layering, funneling, structuring). Batch analysis and shared data will cut down on the analysis time per case, and we will have the analysts review the results and make SAR/No-SAR decisions that will be well supported. Artificial Intelligence will NOT be used to decision SARs versus Non-SARs. **All cases will receive quality control to ensure consistency across all customer case documentation.**

Approximate time to execute:
- 4 hours to complete each case investigation, with efficiencies gained through the batching and analytics processes

## Task 4

All case investigations will be performed in the FCRM AML system following the bank's written procedures; and the investigation narratives will be high-quality, and suitable to effectively substantiate the decision to file or not file a SAR.
This task is to ensure that all case investigations follow the bank's procedures, are well-written and free of typographical and grammatical errors and effectively substantiate the decisioning. We will employ a 100% Quality Control process – all work will go through our seasoned, qualified Quality Control professionals.

## Task 5

All SARs will be drafted in the FCRM AML system following the Bank's written procedures. All data fields within the SAR will be accurately completed, and our narratives will be well- written and error-free.

This task is to ensure that all drafted SARs follow the bank's procedures, are well-written and free of typographical and grammatical errors, and effectively substantiate the decisioning. We will employ a 100% Quality Control process – all work will go through our seasoned, qualified Quality Control professionals.

## Engagement Team

**Engagement Team**

Jefferson Wells will be assigning Risk & Compliance Professionals with relevant Look Back experience to the engagement. Our team has the deep capabilities and specialized knowledge it takes to support Parke Bank's project needs. Each member of our engagement team was selected specifically because they have the right expertise to meet your needs. Our team includes the following:

**C. Michael Baron,** Director Financial Services Industry: Mike brings deep experience in foreign and domestic institutions. He is an accomplished Financial Services Executive who has assisted various clients and companies within Compliance, Risk and Internal Audit, with a focus on Risk Assessments, SOX projects and Execution Services. Mike has established and revamped the functions for various organizations and is familiar with financial, operational and technical assessments.

**Robert Colatarci, Senior Manager** focused on Financia Crimes, has experience working with CRBs, as well as experienced professionals familiar with CRBs, FCRM and the intricacies of marijuana-related SAR requirements.

**Nick Tsoumpariotis, Engagement Manager** is an accomplished Financial Services professional with wide-ranging expertise in Internal Audit, Compliance (AML/BSA), and Enterprise Risk Management.

**Poorna Dharmasena, Data Scientist,** is a seasoned Financial Services professional and Data Scientist with robust experience working with various types of financial institutions. He has extensive experience in issue validation, including executing and overseeing this process. Poorna is adept at leveraging this experience to ensure positive outcomes by leveraging Data analytics. Poorna brings experience in macro econometrics forecasting and time-series analysis using ARMA, ARIMA, SARIMA, VAR, MutiVAR etc. using R, STATA, and Python. His experience also includes data validation, data manipulation, data organization, and data analysis – the fundamental building blocks of macro econometrics modeling.

JW may, under specific circumstances, and with Client's prior written approval, add or re-assign personnel, with no incremental cost to the Client. Any retraining of replacement JW's personnel shall be at the expense of JW.

## Professional Fees and Expenses

We estimate the total project will take approximately 3,100 hours to complete. See below for a detailed breakdown of hours for each task. Our fee proposal is broken out by Task below, Jefferson Wells' fee is **a not to exceed amount** of $375,950, the sum of all Tasks. This results in a blended hourly bill rate of $121 for all professional levels involved in the delivery of this engagement. Should other needs or changes be required, these will be discussed and agreed with Parke Bank management prior to any actions being taken.

### Task 1 – Reassess and disposition 17 case investigations and SAR Narratives

| Role | Number of professionals | Budgeted hours | Hourly Rates | Task Total |
|---|---|---|---|---|
| Engagement Director | 1 | 5 | $205 | $1,025 |
| Engagement Manager | 1 | 10 | $190 | $1,900 |
| Professional(s) | 2 | 135 | $100 | $13,500 |
| **Total** | **4** | **150** | | **$16,425** |

### Task 2 – Conduct approximately 300 Case investigations

| Role | Number of professionals | Budgeted hours | Hourly Rates | Task Total |
|---|---|---|---|---|
| Engagement Director | 1 | 5 | $205 | $1,025 |
| Engagement Manager | 1 | 80 | $190 | $15,200 |
| Professional(s) | 3 | 1,200 | $100 | $120,000 |
| **Total** | **5** | **1,285** | | **$136,225** |

### Task 3 – Conduct 270 case investigations across seven networks

| Role | Number of professionals | Budgeted hours | Hourly Rates | Task Total |
|---|---|---|---|---|
| Engagement Director | 1 | 10 | $205 | $2,050 |
| Engagement Manager | 1 | 40 | $190 | $7,600 |
| Data Analytics/ AI Professional | 1 | 160 | $190 | $30,400 |
| Professional(s) | 1 | 540 | $100 | $54,000 |
| **Total** | **4** | **750** | | **$94,050** |

## Task 4 – Case Investigation Quality Control

| Role | Number of professionals | Budgeted hours | Hourly Rates | Task Total |
|---|---|---|---|---|
| Engagement Manager | 1 | 285 | $190 | $54,150 |
| QC Professional | 1 | 570 | $120 | $68,400 |
| Total | 2 | 855 | | $122,550 |

## Task 5 – SAR Documentation Quality Control

| Role | Number of professionals | Budgeted hours | Hourly Rates | Task Total |
|---|---|---|---|---|
| Engagement Manager | 1 | 10 | $190 | $1,900 |
| QC Professional | 1 | 40 | $120 | $4,800 |
| Total | 2 | 50 | | $6,700 |

Any hours worked in excess of 40 hours by our professionals will need to be pre-approved by Client in writing and will be billed at a rate multiple of 1.5 times the hourly rate.

While this engagement is planned to be performed remotely, any out-of-pocket expenses incurred at request of Client associated, with the completion of the engagement, will be pre-approved by Client in writing and billed at the actual amounts incurred, if applicable. Out of pocket expenses include, but are not limited to, air and ground transportation, accommodations, food and mileage.

JW will invoice bi-weekly. Per the Agreement, invoices are due thirty (30) days after receipt of invoice.

**Deliverables**

The JW personnel will complete work assignments for and under the direction of Client management.

The nature, timing, and level of detail for deliverables will be determined by Client over the course of this engagement. All work products will be the property of Client who will assume ultimate responsibility for the review of any and all deliverables.

Our current understanding of the required deliverables are:
- Task 1: 17 re-written Suspicious Activity Reports (if appropriate and needed) along with all supporting documentation
- Task 2: 3,898 Cleared FCRM Alerts with all supporting documentation
- Task 3: A report that documents the relationships of the 270 customers linked across 7 networks in accordance with regulatory expectations
- Task 4: Completed Quality Control checklists for 100% of the cases and alerts
- Task 5: Completed Quality Control checklists for 100% of recommended or revised SARs

Any further addition to these deliverables will be discussed with management and be subject to the Change Order process.

## Additional Provisions

**Client Responsibilities:** It is expected that all information, data and records required to satisfy the above project objectives and will be provided on a timely basis by Client to the JW team. JW will promptly notify Client senior manager of any/all missing items or systems access issues that could slow down the work., and timely resolution of such items will be critical to ensure project objectives are met within the stated time frame. Any material delay in the supply of information by Client to the JW team will be deemed cause for a change order to this SOW.

Additionally, Client will be responsible for the following:

- Providing a contact who will make all management decisions with respect to the engagement;
- Providing all project-related documents, work plans, templates, assessments and tools on a timely basis;
- Accuracy and completeness of content provided to JW by Client or from a Third Party through Client;
- Future actions with respect to the matters addressed in the deliverables, including implementation decisions;
- Providing JW with directions and instructions relating to any laws or regulations applicable to the protection of data stored by Client;
- Any delays, additional costs incurred, or non-compliance caused by or associated with Client's failure to uphold its responsibilities;
- Making available management and staff to answer questions and provide evidence in a timely manner;
- Providing access to Client's systems as needed.

**Limited Warranty:** JW warrants that the services will be provided utilizing reasonable care and skill in accordance with customary industry standards. In the event that Client is not satisfied with the performance of any JW personnel, then upon Client's written request, JW will remove the personnel with whom Client is not satisfied from the assignment, relieve Client of the obligation to pay for the first eight (8) hours of work performed by personnel named on this SOW and use its best efforts to provide a replacement personnel as soon as practicable (the "Limited Warranty"). The Limited Warranty described herein shall be JW's sole obligation to Client and Client's exclusive remedy with respect to any nonconformity or deficiency in the services furnished to Client under this Agreement.

**Change Order Process:** During the engagement, either party may request such additions, deletions, or modifications to the scope or nature of the Services described in this SOW (all referred to hereinafter as "Changes"). Upon a request for a Change, JW shall submit to Client JW's standard Change Order form describing the Changes, including, as applicable, the impact of such Changes on assumptions, schedule, fees and expenses. Within 10 days of receipt of the proposed Change Order, Client must indicate its written acceptance by signing the Change Order or advise JW to proceed with the original Services. In the absence of a Change Order, if JW incurs additional work, at the request of, or with notice to Client, that is outside the scope of Services in this SOW, Client shall compensate JW at the same rates as those described under Fees & Expenses above.

This SOW will be effective and become an integral part of the Agreement as of the date of the last-executed authorized signature below (the "Effective Date"). This SOW supersedes any and all previous or contemporaneous agreements and understandings with respect to the subject matter of this SOW provided that the Agreement remains in full force and effect. This SOW performs the same function as a purchase order. Any changes to this SOW will be documented and agreed upon in writing in a separate Change Order.

Experis US, LLC for its Jefferson Wells division

By: _____
     C. Michael Baron, Director – Financial Services

By: __Mindy Grabow_____
     Mindy Grabow, Business Development Manager

Acknowledged and Accepted:

Parke Bank

By (signature): _____

By (print name): _____Ralph Gallo_____

Title: _____EVP & COO_____

Date: _____7/7/2025_____

Exhibit C



Jefferson
Wells®
ManpowerGroup

# BSA Alerts Backlog
# Clearance Services
## Statement of Work

## Prepared for Parke Bank



Case 2:26-cv-00217-NJ    Filed 02/09/26    Page 25 of 42    Document 1

July 30, 2025

# Privacy of Content

The information contained herein is considered privileged, confidential and the property of Jefferson Wells, a division of Experis US, LLC. Its release to third parties would offer substantial benefit to competitors offering similar services. The use or release of this information by the named party above for purposes other than evaluation of its content, or as a basis for contract award, is not authorized.

July 30, 2025

Ralph Bonadies
SVP/CRO/BSAO
Parke Bank
601 Delsea Drive
Sewell, NJ 08080

Dear Ralph:

Thank you for providing Experis US, Inc. with the opportunity for its Jefferson Wells division ("JW") to assist Parke Bank ("Client") with the BSA Alerts Backlog Consulting Services. The following Statement of Work ("SOW") confirms our understanding of the professional services JW will provide to Client and is issued in accordance with and shall be governed by the terms and conditions of the Master Services Agreement between Experis, and the Client ("Agreement"). All capitalized terms used in this SOW but not defined herein, shall have the meanings set forth in the Agreement.

## JW Services and Responsibilities

The service period for this SOW is for the period commencing on or around 8/6/2025 through 10/31/2025. Services provided by JW will be performed under a Co-Sourcing methodology and will therefore be managed on a day-to-day basis by the Client. The JW professionals will report directly to LaDonna Burden, BSA Supervisor, or a designee as determined by the Client. The JW professionals will work remotely using a Parke Bank laptop.

The JW personnel shall observe the Client's reasonable policies regarding working conditions and business hours; to the extent such policies are made known to the JW personnel.

## Scope and Approach

We will investigate 2,589 BSA alerts that are 60+ days old. While the time to investigate a BSA alert can vary widely depending on the complexity of the case, the Bank's resources, and the alert type, we estimate we will take an average of approximately 2 hours per alert for a total of approximately 4,685 hours to complete all tasks concurrently.

The timeline for our BSA Alert Backlog Clearance Services is expected to start on or about August 6, 2025, and conclude on or about October 31, 2025.

Below is our general methodology, based on what we know. We will confirm and tailor this during the planning phase of this engagement.

| **TASK 1** | **TASK 2** | **TASK 3** | **TASK 4** |
|---|---|---|---|
| Review 2,589 BSA Alert Investigations | Case Development and SAR Narratives if Warranted | BSA Investigation & Case Development Quality Control | SAR Documentation Quality Control |

We've included detailed information about each task on the following pages.

## Task 1
**Review the 2,589 BSA alerts that are 60+ days old.**

JW will work with the Parke Bank BSA Team to review alerts generated by the Bank's transaction monitoring system (FCRM). These alerts are triggered by specific rules and parameters designed to identify unusual or suspicious transactions. Investigations require comprehensive reviews to gather information, analyze the customer's activity, and research the customer to identify suspicious activity. We'll assign five individuals familiar with FCRM and the intricacies of marijuana-related BSA alerts. 100% of all alerts will be subject to our Quality Control process – performed by a seasoned, qualified Quality Control professionals.

Approximate time to execute:
- 2,354 hours or 50% of the total 4,685 hours estimated to complete.

## Task 2
**Based on the BSA alert investigations, JW professionals will determine if the individual and business customer activity is suspicious and requires further action.**

JW professionals will build a case by documenting their findings, including the investigation process, and rationale. Documentation will be prepared and maintained in alignment with Parke Bank's procedures. If the investigation reveals an additional level of risk or complexity, JW will escalate the case to the BSA Supervisor for further review and guidance. If the activity meets the criteria of a SAR, the JW professional will draft the SAR for management to file. We'll assign four individuals with case investigation and SAR experience.

Approximate time to execute:
- 1,604 hours or 34% of the total 4,685 hours estimated to complete.

## Task 3
**All BSA investigations and case developments will be performed in the FCRM AML system following the Bank's written procedures; and the investigation narratives, including the due diligence documents, will be high-quality, and suitable to effectively substantiate the decision to file or not file a SAR.**

This task is to ensure that all BSA investigations and resulting case and due diligence documents follow the Bank's procedures, are well-written and free of typographical and grammatical errors and effectively substantiate the decisioning. 100% of the work will be subject to our Quality Control process performed by a seasoned, qualified Quality Control professional.

Approximate time to complete:
- 469 hours or 10% of the total 4,685 hours estimated to complete.

## Task 4

**All SARs will be drafted in the FCRM AML system following the Bank's written procedures. All data fields within the SAR will be accurately completed, and our narratives will be well-written and error-free.**

This task is to ensure that all drafted SARs follow the Bank's procedures, are well-written and free of typographical and grammatical errors and effectively substantiate the decisioning. We will employ a 100% Quality Control process – all work will go through our seasoned, qualified Quality Control professionals.

<u>Approximate time to complete:</u>
- 258 hours or 6% of the total 4,685 hours estimated to complete.

## Engagement Team, Professional Fees and Expenses

### Engagement Team

Jefferson Wells will be assigning Risk & Compliance Professionals with relevant BSA alert investigations experience to the engagement. Our team has the deep capabilities and specialized knowledge it takes to support Parke Bank's project needs. Each member of our engagement team was selected specifically because they have the right expertise to meet your needs. Our team includes the following:

**C. Michael Baron,** Director Financial Services Industry: Mike brings deep experience in foreign and domestic institutions. He is an accomplished Financial Services Executive who has assisted various clients and companies within Compliance, Risk and Internal Audit, with a focus on Risk Assessments, SOX projects and Execution Services. Mike has established and revamped the functions for various organizations and is familiar with financial, operational and technical assessments.

**Robert Colatarci, Senior Manager** focuses on Financial Crimes, has experience working with CRBs, as well as managing experienced professionals familiar with CRBs, FCRM and the intricacies of marijuana-related SAR requirements.

**Nick Tsoumpariotis, Engagement Manager** is an accomplished Financial Services professional with wide-ranging expertise in Internal Audit, Compliance (AML/BSA), and Enterprise Risk Management.

JW may, under specific circumstances, and with Client's prior written approval, add or re-assign personnel, with no incremental cost to the Client. Any retraining of replacement JW's personnel shall be at the expense of JW.

If, for any reason, personnel are unable to complete the service period, or if Its performance does not meet the Client's expectations, JW will endeavor to provide a suitable replacement, subject to Client's approval. If JW is unable to identify a replacement acceptable to Client, this Agreement will be deemed to have automatically ended with respect to that individual except that Client shall remain liable to JW for services of said personnel prior to his termination.

## Professional Fees and Expenses

We estimate the total project will take approximately 4,685 hours to complete. Below is a detailed breakdown of hours and fees for each task. Jefferson Wells' fee is **not to exceed** $497,460, the sum of all Tasks. This results in a blended hourly bill rate of approximately $106 for all professional levels involved in the delivery of this engagement. Should other needs or changes be required, these will be discussed and agreed with Parke Bank management prior to any actions being taken.

### Task 1 – Review 2,589 BSA Alert Investigations

| Role | Number of professionals | Budgeted hours | Hourly rates | Task total |
|---|---|---|---|---|
| Engagement Director | 1 | 5 | $205 | $1,025 |
| Engagement Manager | 1 | 14 | $190 | $2,660 |
| Professional(s) | 5 | 2,335 | $100 | $233,500 |
| Total | 7 | 2,354 | | $237,185 |

### Task 2 – Case Development and SAR Narratives

| Role | Number of professionals | Budgeted hours | Hourly rate | Task total |
|---|---|---|---|---|
| Engagement Director | 1 | 5 | $205 | $1,025 |
| Engagement Manager | 1 | 70 | $190 | $13,300 |
| Professional(s) | 4 | 1,529 | $100 | $152,900 |
| Total | 6 | 1,604 | | $167,225 |

### Task 3 – BSA Investigation & Case Development Quality Control

| Role | Number of professionals | Budgeted hours | Hourly rate | Task total |
|---|---|---|---|---|
| Engagement Manager | 1 | 73 | $190 | $13,870 |
| QC Professional | 1 | 396 | $120 | $47,520 |
| Total | 2 | 469 | | $61,390 |

### Task 4 – SAR Documentation Quality Control

| Role | Number of professionals | Budgeted hours | Hourly rate | Task total |
|---|---|---|---|---|
| Engagement Manager | 1 | 10 | $190 | $1,900 |
| QC Professional | 1 | 248 | $120 | $29,760 |
| Total | 2 | 258 | | $31,660 |

| Task | Budgeted hours | Percentage | Totals by Task |
|------|----------------|------------|----------------|
| **Task 1 - 2,589 BSA Alert Investigations** | 2,354 | 50% | $237,185 |
| **Task 2 – Case Development and SAR Narratives** | 1,604 | 34% | $167,225 |
| **Task 3 – BSA Investigations & Case Development Quality Control** | 469 | 10% | $61,390 |
| **Task 4 – SAR Documentation Quality Control** | 258 | 6% | $31,660 |
| **TOTAL** | **4,685** | **100%** | **$497,460** |

Any hours worked in excess of 40 hours by our professionals will need to be pre-approved by Client in writing and will be billed at a rate multiple of 1.5 times the hourly rate.

While this engagement is planned to be performed remotely, any out-of-pocket expenses incurred at request of Client associated, with the completion of the engagement, will be pre-approved by Client in writing and billed at the actual amounts incurred, if applicable. Out of pocket expenses include, but are not limited to, air and ground transportation, accommodations, food, and mileage.

JW will invoice bi-weekly. Per the Agreement, invoices are due thirty (30) days after receipt of the invoice.

**Deliverables**

The JW personnel will complete work assignments for and under the direction of Client management.

The nature, timing, and level of detail for deliverables will be determined by the Client over the course of this engagement. All work products will be the property of Client who will assume ultimate responsibility for the review of any and all deliverables.

**Additional Provisions**

***Client Responsibilities:*** It is expected that all information, data and records required to satisfy the above project objectives will be provided on a timely basis by the Client to the JW team. JW will promptly notify Client senior manager of any/all missing items or systems access issues that could slow down the work. Timely resolution of such items will be critical to ensure project objectives are met within the stated time frame. Any material delay in the supply of information by Client to the JW team may impede our progress and will be discussed with senior management to determine if a change order to this SOW will be needed.

Additionally, Client will be responsible for the following:

- Providing a contact who will make all management decisions with respect to the engagement;
- Providing all project-related documents, work plans, templates, assessments and tools on a timely basis;
- Accuracy and completeness of content provided to JW by Client or from a Third Party through Client;
- Future actions with respect to the matters addressed in the deliverables, including implementation decisions;
- Providing JW with directions and instructions relating to any laws or regulations applicable to the protection of data stored by Client;
- Any delays, additional costs incurred, or non-compliance caused by or associated with Client's failure to uphold its responsibilities;
- Making available management and staff to answer questions and provide evidence in a timely manner;
- Providing access to Client's systems as needed.

**Limited Warranty:** JW warrants that the services will be provided utilizing reasonable care and skill in accordance with customary industry standards. In the event that Client is not satisfied with the performance of any JW personnel, then upon Client's written request, JW will remove the personnel with whom Client is not satisfied from the assignment, relieve Client of the obligation to pay for the first eight (8) hours of work performed by personnel named on this SOW and use its best efforts to provide a replacement personnel as soon as practicable (the "Limited Warranty"). The Limited Warranty described herein shall be JW's sole obligation to Client and Client's exclusive remedy with respect to any nonconformity or deficiency in the services furnished to Client under this Agreement.

**Change Order Process:** During the engagement, either party may request such additions, deletions, or modifications to the scope or nature of the Services described in this SOW (all referred to hereinafter as "Changes"). Upon a request for a Change, JW shall submit to Client JW's standard Change Order form describing the Changes, including, as applicable, the impact of such Changes on assumptions, schedule, fees and expenses. Within 10 days of receipt of the proposed Change Order, Client must indicate its written acceptance by signing the Change Order or advise JW to proceed with the original Services. In the absence of a Change Order, if JW incurs additional work, at the request of, or with notice to Client, that is outside the scope of Services in this SOW, Client shall compensate JW at the same rates as those described under Fees & Expenses above.

This SOW will be effective and become an integral part of the Agreement as of the date of the last-executed authorized signature below (the "Effective Date"). This SOW supersedes any and all previous or contemporaneous agreements and understandings with respect to the subject matter of this SOW provided that the Agreement remains in full force and effect. This SOW performs the same function as a purchase order. Any changes to this SOW will be documented and agreed upon in writing in a separate Change Order.

Experis US, LLC for its Jefferson Wells division

*C. Michael Baron*

By: _____
       C. Michael Baron, Director – Financial Services


By:   __*Mindy Grabow*_____
       Mindy Grabow, Business Development Manager


Acknowledged and Accepted:

Parke Bank

By (signature): _____

By (print name):    Ralph Gallo

Title:    EVP & CCO

Date:    8/1/2025

Exhibit D



November 18, 2025

Ralph Gallo, Executive Vice President & Chief Operating Officer
Parke Bank


Dear Mr. Gallo,

This letter shall serve as a response to your November 14th, 2025 letter, in which you assert that Jefferson Wells is in breach of the Master Services Agreement ("MSA") dated July 7, 2025. We are not in agreement that we are in breach of the MSA. In fact, it is Parke Bank that is in breach of the MSA and both related Statements of Work (the "SOWs").

Jefferson Wells has been transparent throughout this engagement in communicating the weekly progress on both Lookback and Backlog projects. Our Weekly Status reports have highlighted our progress from prior week, technical issues that have occurred, RFI's that remain outstanding, production budget to actual hours by task, etc. We have also been responsive to any and all of Parke Bank's questions. In contrast, Parke Bank has consistently requested that Jefferson Wells perform work that is outside the scope of the MSA and SOWs, refused to execute Change Orders to reflect the modified scope of work requested, and has been unresponsive to several of Jefferson Wells' requests for additional information, assistance, and the ability to install an automated tool to Parke Bank's systems that would facilitate Jefferson Wells completing the tasks contemplated by the SOWs quicker.

We have shared with Parke Bank that the work and activity we are conducting includes the tasks in our SOWs for both projects, in addition to work that is directed at Parke Bank's requests that are outside the scope of the SOWs. On October 23, 2025, we provided Parke Bank with a Matrix that clearly indicates the gaps between the SOW requirements and the Tasks and Activities that Parke Bank is now asking Jefferson Wells to perform. These include the following:

- On Backlog- Parke Bank's FCRM 180 system generated alerts that require dispositioning beyond the 2589 that was contracted for in our agreement. As of the week ending 11/7, that number has increased to 223 additional alerts.

- CDD/ EDD Related Activities were not part of our SOWs - yet to complete the Parke Bank work templates, Jefferson Wells would be required to perform these additional tasks as part of Parke Bank's processes.

- On Lookback – Parke Bank's FCRM system generated alerts, as of week ending November 7, 2025, has grown to 2982 beyond the contracted 3898 CLA-identified alerts.

- Parke Bank's FCRM system does not maintain accurate and complete client information contradicting the 6.18 QA response from Parke Bank during the RFP processes with vendors.

Upon Parke Banks request, we provided examples that supported the additional alerts and activities cited above on October 24, 2025. We asked several times if Parke Bank had any questions regarding the Matrix and associated examples and received no response beyond "still reviewing."

Jefferson Wells is aware of the regulatory compliance pressures Parke Bank faces and has continued to work in good faith despite Parke Bank's many breaches of the MSA and SOWs, including Parke Bank's failure comply with the "Client Responsibilities" section of each SOW as described above, and failure to pay even a ***single invoice*** since this project began. Contrary to the assertions in your letter, the additional tasks that Parke Bank has requested Jefferson Wells to complete are well beyond the requirements detailed in our original SOWs. This expanded scope of work justifies our Change Order requests, and Jefferson Wells cannot proceed with the additional requested work without these Change Orders executed.

Without immediate payment of the past due invoices, agreement on Change Orders reflecting the expanded scope of work that Parke Bank is now requesting, and a plan for Parke Bank to cure its breaches of the Client Responsibilities portion of the SOWs within 10 business days of this communication, Jefferson Wells will be forced to terminate the MSA and both SOWs due to Parke Bank's continuing and material breaches of the MSA and SOWs. While Section 4 of the MSA permits Jefferson Wells to terminate the MSA and SOWs immediately and without further notice due to Parke Bank's failure to pay, Jefferson Wells is willing to discuss a path forward at the regularly-scheduled meeting tomorrow, Wednesday, November 19. Such discussion must include: (a) Parke Bank's immediate payment of all past due invoices, (b) Parke Bank's plan to cure its breaches of the Client Responsibilities portion of the SOWs by December 2, 2025, and (c) negotiation and signature of Change Orders that properly reflect Parke Bank's requested expanded scope of work.

If Parke Bank does not attend the meeting tomorrow, or if the parties are unable to resolve the issues described above, Jefferson Wells will have no choice but to terminate the MSA and SOWs for non-payment (or, in the case of the breach of the Client Responsibilities sections of the SOWs, for failure to cure within 10 business days of this letter) and pursue its legal rights and remedies against Parke Bank. Jefferson Wells reserves all of its rights as against Parke Bank, including, without limitation, its rights to initiate litigation against Parke Bank for Parke Bank's breaches of the MSA and SOWs. I will remind you that termination of

the MSA or SOWs by either party does not relieve Parke Bank of its obligation to pay Jefferson Wells for work completed.

Our team looks forward to speaking with you tomorrow at our regularly scheduled time.


Sincerely,


Chris Wasilk
Senior Vice President
Jefferson Wells

Exhibit E



November 19, 2025

Ralph Gallo, Executive Vice President & Chief Operating Officer
Parke Bank

Mr. Gallo,

Based on your November 19, 2025 email communication in response to my letter dated November 18, 2025, it is clear that Parke Bank has no intention of promptly paying the past due amounts it owes. Accordingly, this letter serves as Jefferson Wells' formal termination of the following Master Service Agreement all related Statements of Work:

- Master Services Agreement dated effective July 7, 2025 between Experis US LLC, for its Jefferson Wells division ("Jefferson Wells") and Parke Bancorp, Inc. ("Parke Banke") (the "MSA");
- Look Back Consulting Services Statement of Work dated July 7, 2025 (the "Look Back SOW");
- BSA Alerts Backlog Clearance Services Statement of Work dated August 1, 2025 (the "BSA SOW").

**Each of the MSA, Look Back SOW, and BSA SOW are hereby immediately terminated pursuant to Section 4 of the MSA due to Parke Bank's failure to pay Jefferson Wells' invoices within the 30-day time period specified in the MSA.** As set forth in Section 4 of the MSA, Jefferson Wells will promptly provide an invoice to Parke Bank for all previously unbilled amounts due under the MSA, the Look Back SOW, and the BSA SOW, and Parke Bank is required to pay the amount set forth on such invoice within 30 days of receipt. Note that Parke Bank's obligation to pay previously issued invoices remains unchanged, and many of those invoices are now substantially past due.

Additionally, please note that in accordance with the Change Order Process provision of both the Look Back SOW and the BSA SOW, Parke Bank must pay for all additional work performed by Jefferson Wells at the request of Parke Bank or with notice to Parke Bank, at the same rates as set forth in the Fees & Expenses portion of each applicable SOW.

Jefferson Wells reserves all of its legal rights and remedies against Parke Bank, including, without limitation, the right to initiate litigation against Parke Bank in the event of continued non-payment.

Sincerely,

Chris Wasilk
Senior Vice President
Jefferson Wells

# Exhibit F



Quarles & Brady LLP
Attorneys at Law
411 East Wisconsin Avenue
Suite 2400
Milwaukee, WI 53202-4428
414-277-5000
Fax 414-271-3552
quarles.com

Writer's Direct Dial: 414-277-3018
E-Mail: Katie.Mason@quarles.com

December 5, 2025

**<u>VIA EMAIL AND U.S. MAIL</u>**

Ralph Gallo
Executive Vice President & Chief Operating Officer
Parke Bank
601 Delsea Drive
Sewell, NJ 08080
rgallo@parkebank.com

     Re:    Demand for Payment Due to Experis US LLC, d/b/a Jefferson Wells

Dear Mr. Gallo,

My firm represents Experis US LLC, d/b/a Jefferson Wells ("Jefferson Wells") with regard to that certain Master Services Agreement dated July 7, 2025 between Jefferson Wells and Parke Bancorp, Inc. ("Parke Bank") (the "MSA"), the Look Back Consulting Services Statement of Work dated July 7, 2025 (the "Look Back SOW") and the BSA Alerts Backlog Clearance Services Statement of Work dated August 1, 2025 (the "BSA SOW") (collectively, the Look Back SOW and the BSA SOW are referred to herein as the "SOWs"). If Parke Bank has retained legal counsel regarding this matter, please forward this correspondence to that counsel.

As set forth in the correspondences from Chris Wasilk of Jefferson Wells to you dated November 18, 2025 and November 19, 2025, Parke Bank is in breach of the MSA and related SOWs for, among other things, failure to pay Jefferson Wells' invoices within the time required by Section 2 of the MSA. As you know, Jefferson Wells terminated the MSA and both SOWs on November 19 as a result of Parke Bank's failure to timely pay Jefferson Wells' invoices in accordance with contract terms.

In accordance with Section 4 of the MSA, Jefferson Wells promptly invoiced Parke Bank for all previously-unbilled amounts due under the MSA and SOWs following termination of the MSA and SOWs. As of today's date, Parke Bank owes Jefferson Wells $1,119,947.50 in unpaid invoices, of which $434,700.00 is substantially past due.

QB\99778158.1

Chicago • Denver • Indianapolis • Madison • Milwaukee • Minneapolis • Naples • Phoenix • St. Louis • San Diego • Tampa • Tucson • Washington, D.C.

This letter serves as a formal demand for immediate payment of all past due invoices, and a reminder that all remaining invoices must be paid by Parke Bank within 30 days of receipt. In the event that Jefferson Wells does not receive payment in full of all past due invoices by December 15, 2025 and does not receive payment of all remaining invoices within 30 days of receipt, Jefferson Wells intends to escalate this matter. Jefferson Wells of course reserves all of its rights under the MSA and related SOWs, including, without limitation, the right to initiate litigation to enforce payment and other provisions of the MSA and SOWs.

If you wish to discuss this matter with me, please feel free to contact me at 414-277-3018 or by email at katie.mason@quarles.com.

Very truly yours,

QUARLES & BRADY LLP

L. Katie Mason